### W. S. PECK CO. v. LOWENBEIN.

(Circuit Court of Appeals, Fourth Circuit. February 21, 1910.)

#### No. 926

BANKRUPTCY (§ 407*)—DISCHARGE—GROUNDS FOR REFUSAL—"FALSE STATEMENT."

A materially false statement within the meaning of Bankr. Act July 1, 1898, c. 541, § 14b(3), 30 Stat. 550 (U. S. Comp. St. 1901, p. 3427), as amended by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 (U. S. Comp. St. Supp. 1909, p. 1310), which makes it a ground for denying a dis-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

charge to a bankrupt that he has obtained property on credit from any person on a materially false statement in writing made to such person for the purpose of obtaining such property on credit, must have been made with knowledge that it was untrue and with fraudulent intent; and a statement made by one partner from facts stated to him by his copartner, who was to furnish the entire capital for the business, although in fact untrue, will not defeat the right of the partner making it to a discharge, where the untruthfulness of the material statements so made was not known to him.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 760; Dec. Dig. § 407.*

For other definitions, see Words and Phrases, vol. 3, p. 2670.]

Waddill, District Judge, dissenting.

Appeal from the District Court of the United States for the Western District of North Carolina, at Asheville, in Bankruptcy.

In the matter of Julius Lowenbein, bankrupt. Appeal by the W. S. Peck Company from an order granting the bankrupt a discharge. Affirmed.

Mark W. Brown, for appellant.

R. R. Williams (Jones & Williams, on the brief), for appellee.

Before PRITCHARD, Circuit Judge, and WADDILL and CONNOR, District Judges.

PRITCHARD, Circuit Judge. This is an appeal from the District Court for the Western District of North Carolina, sitting in bankruptcy, in Re W. S. Peck Company, Creditor, Appellant, v. Julius Lowenbein, Bankrupt, Appellee, and involves the question as to whether the appellee is entitled to a discharge in bankruptcy.

The substance of the facts reported by the special master upon which he bases his conclusion is that on September 14, 1907, Lowenbein wrote a statement of the financial condition of the firm of Owens & Lowenbein addressed to W. S. Peck & Co., Baltimore, Md.; that Lowenbein wrote the statement at the dictation of Owens, and that it was based almost entirely upon the information which Lowenbein derived from Owens in the preparation of it; that matters in the statement other than those furnished by Owens were not misleading, being in the main true.

It appears further from the testimony elicited in the examination that Owens was ostensibly a man of means at the time that he owned the stock of goods in his store at Asheville and had in control a considerable quantity of real estate in that city. The terms of the partnership were that Owens was to furnish the capital, and Lowenbein was to manage and conduct the business of merchandising in behalf of the firm and was to have an equal interest in the business. Lowenbein had at the time he went into the business about $1,000 deposited in the bank at Asheville, and of this amount he expended in the way of expenses to New York and in payments of freights, etc., for the firm nearly $500. Soon after the firm commenced business, Lowenbein was taken sick and carried to the hospital, and whilst he was there Owens proceeded to have the firm adjudged bankrupt.

The referee finds as a fact that in making the statement to Peck & Co. Lowenbein was not actuated by any fraudulent purpose, and it further appears that Lowenbein refused to join with Owens in demanding the personal exemption of $500 each allowed by the laws of North Carolina, and thus permitted the $1,000 which would have been taken from the stock of goods on hand at the time of the failure to go to the benefit of the creditors. However, upon these facts, the referee held that neither Owens nor Lowenbein were entitled to a discharge.

The learned judge who heard the case below filed an opinion, in which, among other things, he said:

"There can be no controversy in the case as to Owens, because the testimony throughout shows that his statements were false and his conduct prompted by a fraudulent intent. As to Lowenbein the special master says: 'I come to this conclusion (that Lowenbein is not entitled to a discharge) upon the authority In re Gilpin [D. C.], 160 Fed. 171, where the question whether the written statement, under section 14b (3) (Act July 1, 1898, c. 541, 30 Stat. 550 [U. S. Comp. St. 1901, p. 3427]), must have been made with a fraudulent intent, is exhaustively considered, and the conclusion is reached that such intent need not exist, but that it is sufficient within the meaning of the clause to bar a discharge that the statement be materially untrue.' And he cites, also, In re Hardie [D. C.] 143 Fed. 607. Upon examination I find that the case referred to, In re Gilpin, was decided by the District Court of the United States for the Eastern District of Pennsylvania. This case was carried by petition to revise for error of law to the Circuit Court of Appeals for the Third Circuit, wherein the decision of the District Court was reversed. Gilpin v. Bank, 165 Fed. 607 [91 C. C. A. 445, 20 L. R. A. (N. S.) 1023]. Gray, Circuit Judge, in delivering the opinion of the court in the case, said: 'The bankrupt who has made to a creditor, for the purpose of obtaining credit, a false statement—that is, one intentionally and knowingly untrue—is unworthy of the privilege of a discharge under the act, and the court will act upon information brought to it of such an act by any party in interest. It will be at once conceded on all hands that such a bankrupt is unworthy, and should not receive the favor accorded by the law to the honest but unfortunate debtor.' But it is further held in this case that the statement upon which credit was obtained, and which was made for the purpose of obtaining credit, must not only be erroneous or untrue, but must import an intention to deceive and such a statement, in order to constitute a bar to discharge must have been knowingly and intentionally untrue. A case cited by the special master in addition to the one above referred to is In re Hardie (decided by the District Court of the United States for the Western District of Texas) 143 Fed. 607. That case was reviewed by the Circuit Court of Appeals for the Fifth Circuit and the decision of the District Court reversed. Hardie v. Dry Goods Co., 165 Fed. 588 [91 C. C. A. 426, 20 L. R. A. (N. S.) 785]. Judge Pardee, delivering the opinion of the Circuit Court, held that 'a material false statement in writing made by a partner in the ordinary course of business in the partnership in buying merchandise for the purpose of obtaining goods on credit, and by means of which they were so obtained by the firm, is not ground for refusing a discharge in bankruptcy to another partner who did not participate in the wrongful act and had no knowledge of it.' "

This is a very full and complete statement of the facts, as well as the law, bearing on this subject.

In the case of Gilpin v. Merchants' National Bank, 165 Fed. 607, 91 C. C. A. 445, 20 L. R. A. (N. S.) 1023, the Circuit Court of Appeals for the Third Circuit passed upon this question, and Judge Gray, who delivered the opinion of the court, said:

"But, apart from the incongruity imported into this section of the bankruptcy act by such construction, it seems to us clear that the plain language of this third clause of section 14b requires that the written statement made by the bankrupt, for the purpose of obtaining credit, etc., should be knowingly and intentionally untrue, in order to constitute a bar to the discharge of the bankrupt. In other words, 'false statement' denotes a guilty scienter on the part of the bankrupt. This primary and ordinary meaning of the word 'false' cannot be ignored. It is the primary meaning given in the ordinary lexicons of the English language. Webster gives as its primary meaning: 'Uttering falsehood; unveracious; given to deceit; dishonest.' As an adjective, it is correlative with the noun 'falsehood.' To charge a person with making a false statement is equivalent to charging him with uttering a falsehood, and imputes moral delinquency to the person so charged. It is true that the word may have a secondary meaning in certain collocations, and be merely equivalent to 'untruth' or 'incorrect.' But this is not the ordinary or usual signification attached to the word. To charge a person with making false entries in books of accounts means something more than that incorrect or untrue entries have been made, and it has been so held by the courts in the consideration of offenses of that character. The last edition of Bouvier's Law Dictionary says of the word 'false,' that, when 'applied to the intentional act of a responsible being, it implies the purpose to deceive.' In Black's Law Dictionary, under the title 'false,' it is said: 'In law this word means something more than untrue. It means something designedly untrue and deceitful, and implies an intention to perpetrate some treachery or fraud.' In a recent and well-accepted publication called 'Words & Phrases,' the word 'false' is thus defined: 'False means that which is not true, coupled with a lying intent. Wood v. State, 48 Ga. 192, 297, 15 Am. Rep. 664.' False in jurisprudence usually imports something more than the vernacular sense 'erroneous' or 'untrue.'"

It was held by the Supreme Court of North Carolina in the case of Des Farges v. Pugh, 93 N. C. 31, 53 Am. Rep. 446, that insolvency and the concealment of the same are not sufficient to render a contract null and void. In that case the court said:

"The facts of insolvency and its concealment alone are not sufficient to enable the vendor to annul the contract. They must be coupled with the intent not to pay for the goods."

It is the evident purpose of the bankruptcy act to protect that unfortunate class of debtors who are unable to pay their debts by giving them a discharge, thus affording them an opportunity to engage in business again, while, on the other hand, it is manifestly intended to deny a discharge to those whose conduct has been such as to show that they obtained credit by false statements calculated and intended to deceive and thereby defraud their creditors.

Construing the act with these ends in view, it would be manifestly unjust to deny a discharge to a debtor when it appears, as it does in this instance, that the statement which he made was not actuated by any fraudulent purpose. This finding of fact has been approved by the learned judge who heard the case below, and is within itself conclusive in so far as the question involved in this controversy is concerned.

For the reasons stated, we are of opinion that the judgment of the court below should be affirmed.

Affirmed.

WADDILL, District Judge (dissenting). I am unable to concur with the majority of the court in this case, and as the subject-matter

is one that largely pertains to the practice of the United States courts in bankruptcy cases, and affects the basis on which the mercantile world daily does business, I shall briefly state my reasons.

The question involved is the true interpretation to be given to subsection 3 of section 14 of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 550 [U. S. Comp. St. 1901, p. 3427]), as amended by Act Feb. 5, 1903, c. 487, § 4, 32 Stat. 797 (U. S. Comp. St. Supp. 1909, p. 1310), relating to the terms under which a bankrupt may secure a discharge. The section briefly is that the judge shall hear the application for discharge, and such proofs and pleas as shall be made in opposition thereto, investigate the merits of the application, and discharge the applicant, unless he has, among other things, "(3rd) obtained property on credit from any person, upon a materially false statement in writing, made to such person, for the purpose of obtaining such property on credit."

The history of the section briefly is that under the original act only two specifications of objection could be made to the granting of a discharge: First, the commission of an offense punishable by imprisonment under the act; second, the fraudulent destruction, concealing, or failing to keep books of account, or records, with intent to conceal one's true financial condition. By the amended act of February 5, 1903, the word "fraudulent" was omitted from the second objection to the granting of the discharge, and six, instead of two, grounds were provided, among them the third hereinbefore cited. This subsection 3, supra, is entirely new, no similar objection to a discharge being in any previous bankruptcy act, English or American, though under the English law a discharge is denied, where one contracts a debt with no reasonable expectation at the time of being able to pay it. Aside from the plain language used, its intent seems manifest, namely, to prevent the procuring by one person from another property on credit, without giving a true statement of his or their financial condition, the language being "upon a materially false statement made to such person for the purpose of obtaining property on credit"; and while the bankrupt law should undoubtedly be liberally construed, to the end that honest debtors may be discharged, it would not seem to be an unreasonable requirement to impose upon persons who seek to secure the property of another on credit and be relieved of liability for the same that the statement they make giving an account of their assets as a basis of credit, and on the faith of which the liability is incurred, should be true. It is concerning a subject as to which a creditor is not advised, and the debtor fully informed; and after property has been secured upon such statement, and not paid for or returned, the latter cannot complain when refused a discharge, especially having admitted that the statement was false in fact, and when made was known to be incorrect.

The opinion of the majority of the court in this case proceeds upon the theory that the true construction of the act is that credit must be obtained by a false statement, made with fraudulent intent, and for the purpose of defrauding the creditor, clearly changing the language of the act from a "materially false statement in writing" to one which the debtor was actuated in making by a fraudulent motive, and with

the purpose, design, and intent to defraud and deceive. The statute says nothing about any fraudulent motive, or any purpose and intent to deceive. It suffices to defeat the discharge, under the existing bankruptcy law, if the debtor makes a statement in writing, as to an existing fact, which he knows is untrue in a material particular, as a result of, and but for which he would not have secured credit. The debtor's act must be construed in the light of the effect it had upon his creditor, and if its necessary result was to defraud the creditor, and it did do so, it does not lie in the mouth of the debtor, who has caused loss to another, secured goods and not paid for them, to claim that he meant no wrong in what he did. He does not occupy that favored position.

We are not considering the technical meaning of false statement, as used in a criminal statute, but dealing with a civil case, and having to determine what interpretation should be given to such language in a business transaction between the party making the statement and another who has been misled and defrauded thereby. The Supreme Court of the United States, considering this general subject, in the case of Cooper v. Schlesinger, 111 U. S. 148, 4 Sup. Ct. 360, 28 L. Ed. 382, a suit involving the right of recovery on account of a false representation made by one party to another, approved an instruction given in that case which contained this language:

"A false representation does not amount to a fraud in law, unless it be made with a fraudulent intent. There is, however, a fraudulent intent if a man, either with a view of benefiting himself, or misleading another into a course of action, makes a representation which he knows to be false or which he does not believe to be true. * * * It is not every misrepresentation in the making of a contract that constitutes a fraud upon which a party may rely to set aside the binding obligation of the contract. The misrepresentation must be in relation to a fact or a state of facts which is material to the transaction. There must be the assertion of a fact on which the person entering into the transaction relied, and in the absence of which it is reasonable to infer that he would not have entered into it, or at least not on the same terms. Both facts must concur. There must be a false and a material representation, and the party seeking relief should have acted upon the faith and credit of such representation."

In further discussing the case Justice Blatchford said:

"* * * * A statement recklessly made without knowledge of its truth was a false statement knowingly made within the settled rule."

In this case there is no dispute that the appellee, Lowenbein, knew that the statement he made was false as to existing facts, and which were admittedly within his knowledge, and that it was made in a connection which necessarily resulted in misleading appellants, causing them to give credit when they otherwise would not have done so. The purpose of their inquiry was to secure information to determine whether credit should be given. The answer was an exhibit justifying the giving of credit.

In Re Dresser, 16 Am. Bankr. R. 561, 562, 563, 146 Fed. 383, 76 C. C. A. 655, a decision of the Circuit Court of Appeals for the Second Circuit, will be found an interesting discussion by Judge Wallace of that court of the very subject under consideration, fully sustaining the views herein expressed. The case of In re Louisville Nat. Banking Co. (In re Pfaffinger) 19 Am. Bankr. R. 309, 158 Fed. 403, 85 C. C.

A. 513, a decision of the Circuit Court of Appeals of the Sixth Circuit, will also be found of interest.

The further suggestion is made here that while the bankrupt's partner, Owens, should confessedly not have been given a discharge, that appellee, Lowenbein, should, because in what he did he relied upon what his partner told him. If this be true as to some of the statements made, as to many of them, in important particulars, it is not. But, if true as to all, it ought not to serve to relieve appellee, as he should be held liable for his partner's statement. If he chooses to rely on such statements, he, and not the innocent creditor, should suffer the consequence.

In a leading case on this subject, Justice Harlan said:

"Each partner was the agent and representative of the firm with reference to all business within the scope of the partnership. And if, in the conduct of partnership business, and with reference thereto, one partner makes false or fraudulent misrepresentations of fact to the injury of innocent persons who deal with him as representing the firm, and without notice of any limitations upon his general authority, his partners cannot escape pecuniary responsibility therefor upon the ground that such misrepresentations were made without their knowledge. This is especially so, when, as in the case before us, the partners, who were not themselves guilty of wrong, received and appropriated the fruits of the fraudulent conduct of their associate in business." Strang v. Bradner, 114 U. S. 555, 561, 5 Sup. Ct. 1038, 1041 (29 L. Ed. 248).

The case of Gilpin v. Merchants' Bank, 165 Fed. 607, 91 C. C. A. 445, 20 L. R. A. (N. S.) 1023, relied on by the court, does not in my judgment sustain the claim of the bankrupt to discharge in this case, however accurate that decision may have been upon the facts, or the definition there given of "false statement" from a lexicographer's point of view. There the statement on which the credit was procured was made by the bankrupt's bookkeeper, and purported to give approximately the assets of the bankrupt, but there was no suggestion that the bankrupt knew, or had any reason to believe, that the statement was false, or that he in any way intended to deceive the bank; indeed, the referee reports directly to the contrary. The learned judge in deciding that case said:

"The bankrupt who has made to a creditor for the purpose of obtaining a credit a false statement—that is, one intentionally and knowingly untrue—is unworthy of the privilege of a discharge under the act."

This language would seem to apply to this case, and demonstrates that, had the facts there been such as here, that the granting of the discharge would not have been thought of.

In this case the facts are briefly that the appellee, together with one J. L. Owens, under the firm name of Owens & Lowenbein, commenced business in the city of Asheville, N. C., on the 15th of August, 1907. They started with liabilities for merchandise amounting to $22,000 and $1,800 for furniture and assets $300 paid into the firm by Lowenbein. The latter was to conduct the business, and the former furnished the credit; he being supposedly a man of property. The business continued under the direction of Lowenbein until the 3d day of January, 1908, when he became ill, and was taken to the hospital. It was continued by Owens until the 16th of January, 1908, when a receiver was appointed for the same in the state court, and bankruptcy proceedings

followed in a few days. The business lasted only five months. On the 14th of September, 1907, Lowenbein wrote in the firm name to the appellants as follows:

To W. S. Peck & Co., Syracuse, N. Y.

Gentlemen: In reply to your request for a statement of our resources and liabilities as a basis for present and future credit, we herewith submit the following statement of facts for the exclusive use and guidance in extending to us a line of credit.

Firm name: Owens & Lowenbein.

Name of each partner: J. L. Owens and Julius Lowenbein.

### Resources.

| | |
|---|---:|
| Stock of merchandise, low value | $22,000 |
| Furniture and fixtures | 1,800 |
| Notes and accounts, good | 6,150 |
| Cash in Battery Park Bank | 1,000 |
| Jewelry and furniture | 1,500 |
| Real estate in Asheville, J. L. Owens | 7,700 |
| Real estate in Asheville, J. L. Owens and wife | 150 |
| Real estate in Asheville, J. L. Owens and wife | 15,000 |
| Interest in another enterprise | 1,500 |
| Total assets | $56,800 |

### Liabilities.

| | |
|---|---:|
| For merchandise and importation | $14,000 |
| Owing on notes secured by real estate | 4,000 |
| Total liabilities | $18,000 |

This statement shall apply to all future purchases until canceled in writing. Dated September 14th, 1907. [Signed] Owens & Lowenbein, 20 22 North Pack Square.

### Résumé.

| | |
|---|---:|
| Excess of assets over liabilities as per statement | $38,800 |
| Excess of partnership assets over liabilities, including liability of $4,000 secured by real estate notes | 15,950 |
| Considering purely partnership assets, viz.: $22,000 (merchandise) and $1,800 (furniture and fixtures) and partnership liabilities as represented by Lowenbein, viz.: $14,000, there is a balance in favor of assets of | 9,800 |

Notwithstanding this splendid exhibit of the firm's assets, within four months after it was made, the collapse came, and the creditors received only about 50 cents on the dollar from the firm assets, and nothing practically from the individual partners. The special master to whom the case was referred in effect found that the statement of assets and liabilities made to appellant was incorrect in nearly every material particular; that J. L. Owens never contributed one cent to the business; that Lowenbein never contributed anything save $160 prior to September 14, 1907, and only $300 after that time, to cover an overdraft made on the Battery Park Bank. He, however, concluded in his twenty-fourth finding that neither Owens nor Lowenbein were actuated by corrupt or fraudulent intent in making the Peck statement, but that they were merely careless and negligent in so doing, and were neither of them entitled to discharge, basing his conclusion upon the fact that it was sufficient to prevent the discharge that the statement was materially untrue; and he further concluded that Owens was not entitled

to his discharge because of his false testimony given before him in the case. The learned district judge sustained the ruling of the referee as to Owens, but reversed it as to Lowenbein, taking the same view substantially of the section in question as that of the majority of the court here, and based his opinion upon the Gilpin Case, supra, 165 Fed. 607, 91 C. C. A. 445, 20 L. R. A. (N. S.) 1023. The special master's report showed that, while as to some of the items contained in the Peck statement in making the same Lowenbein wrote them from the dictation of Owens, as to the several items of stock on hand, furniture and fixtures, cash in bank, and jewelry and furniture, he acted on his own information; and, while as to the item "notes and accounts $6,150" the report does not in specific terms show that it was made by Lowenbein of his own knowledge, still it must have been so, as he, and not Owens, was engaged in the active conduct of this particular business, and, when put to the test in his testimony, he sought to avoid this irresistible conclusion, as shown by the supplemental report of the special master, by saying that by that item "it was intended to say that Owens individually had notes and accounts of the value stated," and the special master vouches the information in his supplemental report, "I find nothing in the evidence tending to show that Owens did not on September 14, 1907, have notes and accounts due him of the value stated"; no suggestion, however, being made, that he did have the same. The absurdity of this position is apparent at a glance. Lowenbein seeks to escape the consequence of making a false statement of the material fact peculiarly within his own knowledge, that "his firm had good notes and accounts due them of $6,150," by saying he meant that his copartner individually had that much due him, without giving the slightest information as to whether it was in point of fact true, even as to his partner individually; and we are asked to adopt and be bound by the statement of the special master, who chose to jump at this conclusion, without making an inquiry as to the truthfulness of the matter. The fact that Lowenbein knew this item in the statement was not true, and that it would result in securing credit to the firm on the false report of the value of its resources, is clear; as is also the fact as to the material statement respecting the item of liability of the firm stated to be about $14,000, when in truth it was $19,000. This is what the special master has to say:

"I find as facts that the liabilities of Owens and Lowenbein on September 14th, on that account, were at least $19,000, and that Lowenbein knew this on that date; that Lowenbein thought he was justified in putting the amount at $14,000 because he believed that Owens would put $5,000 into the business, as he had arranged with Lowenbein that he would do (but which he did not do), and with this $5,000, and about $2,000 which Lowenbein estimated he himself had when they started the business and some of which had gone, and the balance of which he intended should go, into the business, plus $1,000 which he estimated as profits accrued in the business up to September 14th, making $8,000 in all, deducted from the stock of merchandise, $22,000, which they had bought, would reduce the indebtedness ($22,000 originally for the entire stock, if this $8,000 were applied to its reduction) to the amount given in the estimate, to wit, $14,000. I find as a fact that Owens never put in any money into the business of Owens and Lowenbein."

The effect of this statement of the special master, whether you call it a finding or not, is that he (Lowenbein) knew this item of liability

was $19,000, instead of $14,000; that he chose to pretend it was $14,-000 upon the assumption that his partner was going to put $5,000 into the firm assets, which he never did, and that he would put in $2,000, only a nominal part of which he did, and that he was entitled on the 14th of September to $1,000 profit arising from the business for less than a month, making $8,000 to be deducted from the original purchase of $22,000 on credit to start the business. These things all show a patent fraud upon their face, especially when taken in connection with the ultimate outcome of this business, a firm supposedly having nearly $16,000 of assets over liabilities, and one partner's assets alone amounting to $38,800, and four months afterwards the firm was bankrupt, paying the firm creditors 50 cents on the dollar from the partnership assets, and in effect nothing from the individual assets.

Such transactions ought not to be lightly passed by, and bankrupts further rewarded with an acquittance from their indebtedness by a bankruptcy discharge.

My conclusion is that this bankrupt, Lowenbein, is clearly not entitled to his discharge.